## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

VERNA V. TURNER,                                    Case No. 1:19-cv-822
                                                    Litkovitz, M.J.
     Plaintiff,

vs.

COMMISSIONER OF                                     **ORDER**
SOCIAL SECURITY,

     Defendant.

Plaintiff, Verna V. Turner, brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying her application for disability insurance benefits ("DIB"). This matter

is before the Court on plaintiff's Statement of Errors (Doc. 12), the Commissioner's response in

opposition (Doc. 17), and plaintiff's reply memorandum (Doc. 18).

### I. Procedural Background

Plaintiff filed her application for DIB in July 2015, alleging disability since November

15, 2011, due to asthma and reactive airways disease. The application was denied initially and

upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing

before administrative law judge ("ALJ") Renita K. Bivins, on February 13, 2018. Plaintiff and a

vocational expert ("VE") appeared and testified at the ALJ hearing. On July 23, 2018, the ALJ

issued a decision denying plaintiff's DIB application. This decision became the final decision of

the Commissioner when the Appeals Council denied review on July 19, 2019.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548

2

(6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy.  *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

## B.  The ALJ's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The [plaintiff] engaged in substantial gainful activity during the following periods: January 2012 through December 2012 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. However, there has been a continuous 12-month period(s) during which the [plaintiff] did not engage in substantial gainful activity.  The remaining findings address the period(s) the [plaintiff] did not engage in substantial gainful activity.

4. The [plaintiff] has the following severe impairments: asthma, chronic bronchitis, affective disorder, and anxiety disorder (20 CFR 404.1520(c)).

5. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

6. After careful consideration of the entire record, [the ALJ] finds that the [plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except she can frequently climb ramps and stairs; can occasionally climb ladders, ropes, and scaffolds; must avoid concentrated exposure to extreme heat, extreme cold, high humidity, and wetness; must avoid even moderate exposure to respiratory irritants such as fumes, odors, smoke, solvents and cleaners, chemicals, dust, gases, and poorly ventilated areas; must be permitted a 15-minute break approximately every 2 hours; is able to  understand,

remember, and carry out simple and detailed instructions, but no complex instructions; can maintain concentration and attention for 2-hour intervals in an 8-hour workday; can adapt to occasional changes in work-process and environment; is able to be aware of normal hazards and take appropriate precautions, and is capable of independent travel and the use of public transportation.

7. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[1]

8. The [plaintiff] was born [in] . . . 1974 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

9. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).[2]

12. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from November 15, 2011, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-26).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

---

[1] Plaintiff's past relevant work was as an analytical chemist and a research scientist, both light, skilled positions. (Tr. 24, 70).
[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative medium, unskilled occupations such as warehouse worker (40,000 jobs in the national economy); conveyor feeder (24,000 jobs in the national economy); and sandwich maker (52,000 jobs in the national economy). (Tr. 25-26, 71-72).

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

On appeal, plaintiff alleges that the ALJ erred by failing to (1) consider the combined effects of all of plaintiff's severe impairments when questioning the VE, and (2) properly assess

and afford sufficient weight to the opinion of her treating pulmonologist, Dr. Mark Scott. (Doc. 12).

### 1. The ALJ's Step Five finding was supported by substantial evidence

In her first assignment of error, plaintiff argues that the ALJ failed to consider the combined effects of all of her severe impairments when questioning the VE. (Doc. 12 at PAGEID 516). Within this assignment of error, plaintiff also argues that the ALJ erred in her determination that plaintiff could perform the occupations of conveyer feeder, sandwich maker, and warehouse worker. (*Id*. at PAGEID 517).

In response, the Commissioner argues that the ALJ's Step Five finding was supported by substantial evidence. (Doc. 17 at PAGEID 541). Citing to the Dictionary of Occupational Titles ("DOT"), the Commissioner contends that none of the jobs selected by the VE, and subsequently relied upon by the ALJ, such as conveyer feeder, sandwich maker, and warehouse worker, "require exposure to atmospheric conditions." (*Id*. at PAGEID 542).

At Step Five of the sequential evaluation process, the burden shifts to the Commissioner "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 474 (6th Cir. 2003). "This court has held repeatedly that the testimony of a vocational expert identifying specific jobs available in the regional economy that an individual with the claimant's limitation[s] can perform can constitute substantial evidence supporting an ALJ's finding at step 5 that the claimant can perform other work." *Staymate v. Comm'r of Soc. Sec*., 681 F. App'x 462, 469 (6th Cir. 2017) (quoting *Wilson*, 378 F.3d at 549

(citations omitted)).  The ALJ only need incorporate those limitations that she has found to be supported by the evidence.  *Spicer v. Comm'r of Soc. Sec.*, 651 F. App'x 491, 494 (6th Cir. 2016).

Plaintiff argues that the ALJ erred by failing to fully account for her severe impairments and limitations when questioning the VE.  Plaintiff, however, fails to specifically allege *how* the ALJ erred and *what* severe impairments the ALJ allegedly failed to consider.  At the hearing, the ALJ posed a hypothetical which asked the VE to identify jobs available to an individual who, among other restrictions, must avoid concentrated exposure to extreme heat, extreme cold, high humidity, and wetness and must avoid even moderate exposure to respiratory irritants, such as fumes, odors, smoke, solvents, cleaners, chemicals, dust, gas, and poorly ventilated areas.  (Tr. 70-71).  In response, the VE testified that the hypothetical individual would be able to perform the representative occupations of warehouse worker, DOT # 922.687-058; conveyor feeder-offbearer, DOT # 921.686-014; and sandwich maker, DOT # 317.664-010.  (Tr. 71-72).

Plaintiff has not identified any specific evidence that required the inclusion of greater limitations than those found by the ALJ when questioning the VE.  Absent any such evidence, the ALJ did not err by failing to include any alleged additional limitations in her hypothetical.

Plaintiff also argues that the occupations testified to by the VE, and later adopted by the ALJ, fail to fully account for her impairments.  (Doc. 12).  Plaintiff specifically contends: "[h]ow can these occupations not have moderate exposure to respiratory irritants?  That just cannot be the case" (*Id*. at PAGEID 517), and "[i]t is just common sense that a warehouse position will require exposure to dust."  (Doc. 18 at PAGEID 559).

The VE testified at the ALJ hearing, and the ALJ determined in her written decision, that the VE's testimony was based on, and consistent with the information in the DOT. (Tr. 26, 77-78). Counsel for plaintiff did not point out any inconsistencies between the VE's testimony and information in the DOT during the administrative hearing. However, in the Statement of Errors, plaintiff alleges the ALJ erred by selecting occupations that plaintiff believes "have moderate exposure to respiratory irritants[.]" (Doc. 12 at PAGEID 517). Plaintiff contends that because "the warehouse position cannot be performed" by plaintiff "a reversal of the ALJ's decision should be granted or at a minimum a remand for further hearing." (Doc. 18 at PAGEID 559).

The DOT, however, is clear that the positions of warehouse worker, conveyor feeder, and sandwich maker do not require exposure to "atmospheric conditions." *See* DOT # 922.687-058, 1991 WL 688132 (warehouse worker); DOT # 921.686-014, 1991 WL 688096 (conveyer feeder); DOT # 317.664-010, 1991 WL 672749 (sandwich maker). The DOT specifically provides that each of the jobs show "Not Present—Activity or condition does not exist" under the category for Atmospheric Conditions. "Atmospheric conditions" is a phrase commonly used in the DOT which is defined as "[a]n environmental factor . . ., meaning exposure to conditions such as fumes, noxious odors, dusts, mists, gases, and poor ventilation that affect the respiratory system, eyes, or the skin." *See* Program Operations Manual System (POMS) at DI 25001.001(B)(5).[3] Therefore, substantial evidence supports the ALJ's Step Five finding that the

---

[3] The POMS is the Program Operations Manual System. *See* https://secure.ssa.gov/poms.nsf/home!readform. It is used internally by employees of the SSA in evaluating Social Security claims and does not have the force and effect of law. *Davis v. Sec'y of Health & Human Servs.*, 867 F.2d 336, 340 (6th Cir. 1989). The POMS explains the meaning of SSA terms as well as the meaning intended by terms appearing within the regulations. *Id*. (citing *Powderly v. Schweiker*, 704 F.2d 1092 (9th Cir. 1983)). *See also Harper-Lee v. Astrue*, No. 2:11-cv-571, 2012 WL 4483007, at *5 (S.D. Ohio Sept. 27, 2012) ("The POMS states only internal SSA guidance.").

jobs identified by the VE were consistent with plaintiff's RFC.

Even assuming, arguendo, as plaintiff contends, that the position of warehouse worker "would have dust involved" and therefore "cannot be performed" (Doc. 18 at PAGEID 559), the VE's testimony concerning the sandwich maker and conveyor feeder jobs, when considered together, substantially supports the ALJ's finding that a significant number of jobs exist in the national economy that plaintiff can perform. Under the regulations, "work exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." 20 C.F.R. §§ 404.1566(a), 416.966(a).

The VE testified there are approximately 76,000 such jobs in the national economy (excluding the 40,000 available jobs for the position of warehouse worker) that the hypothetical individual would be able to perform. (Tr. 71-72). Accordingly, *even if* the warehouse position was excluded, the number of jobs in the national economy for a conveyor feeder and sandwich maker constitute a significant number of jobs that exist in the national economy. *See Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) (200 jobs in the region and 6,000 jobs nationwide amounted to "significant numbers" of available jobs) (citing *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 579 (6th Cir. 2009) (2,000 jobs in the national economy constituted a significant number)). *See also Nash v. Sec'y of H.H.S.*, 59 F.3d 171 (Table), 1995 WL 363381, at *3 (6th Cir. June 15, 1995) (70,000 jobs in the national economy was a significant number); *Putman v. Astrue*, No. 4:07-cv-63, 2009 WL 838155, at *2-3 (E.D. Tenn. Mar. 30, 2009) (200-250 regional jobs and 75,000 national jobs constituted significant numbers) (citing cases). Thus, because the evidence establishes that plaintiff could perform a significant number of jobs, even

9

excluding the position of warehouse worker, the ALJ's Step Five finding is supported by substantial evidence.

Plaintiff's contention that the occupations testified to by the VE, and included by the ALJ in her decision, must have moderate exposure to respiratory irritants is therefore without merit and plaintiff's first assignment of error is overruled.

### 2. The ALJ did not err in giving "little weight" to the opinion of Dr. Scott

In her second assignment of error, plaintiff alleges that the ALJ erred by failing to afford sufficient weight to Dr. Scott's opinion that plaintiff "is likely to miss approximately four days of work per month due to severe asthma and could not be exposed to any and all environmental allergens that would cause a severe reduction in breathing." (Doc. 12 at PAGEID 518, citing Tr. 413). Plaintiff contends that "[t]here is no evidence which contradicts Dr. Scott's opinion in this regard, and his opinion is well supported by the evidence[.]" (*Id*. at PAGEID 519).

In response, the Commissioner alleges that the ALJ reasonably evaluated the medical opinion of Dr. Scott and provided good reasons for not adopting Dr. Scott's opinion. (Doc. 17 at PAGEID 537). The Commissioner contends that the ALJ's decision correctly explains that Dr. Scott's opinion is inconsistent with the medical evidence of record and plaintiff's treatment history. (*Id*.).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight.[4] Under the treating physician rule, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. . . ." *Rogers*, 486

---

[4] Section 404.1527, which sets out the treating physician rule, has been amended for claims filed on or after March 27, 2017. *See* 20 C.F.R. § 404.1520c. This amendment does not apply to plaintiff's claims, which she filed in 2015.

F.3d at 242; *Wilson*, 378 F.3d at 544. The rationale for the rule is that treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." *Rogers*, 486 F.3d at 242.

A treating source's medical opinion must be given controlling weight if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). If a treating source's medical opinion is not entitled to controlling weight, the ALJ must apply the following factors in determining what weight to give the opinion: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544. *See also Blakley*, 581 F.3d at 408 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4) ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in" 20 C.F.R. § 404.1527(c)).

In addition, an ALJ must "give good reasons in [the] notice of determination or decision for the weight [given to the claimant's] treating source's medical opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c). The ALJ's reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

11

*Gayheart*, 710 F.3d at 376 (citing Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5). This requirement serves a two-fold purpose: (1) it helps a claimant to understand the disposition of h[er] case, especially "where a claimant knows that h[er] physician has deemed h[er] disabled," and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Wilson*, 378 F.3d at 544.

Plaintiff began treating with Dr. Scott in September 2012. (Tr. 394-96). Dr. Scott noted ongoing asthma and the use of "rescue inhalers and nebulizers." (Tr. 394). Plaintiff reported that she had not used her rescue inhaler in the past two weeks, and on examination, Dr. Scott found normal chest movement and breathing with no wheezing. (Tr. 394, 396). He assessed major depression, extrinsic asthma with exacerbation, acute sinusitis, and allergic rhinitis. (*Id*.). On November 7, 2012, Dr. Scott did not observe any difficulty breathing. Plaintiff reported that although she had some difficulty with increased wheezing and chest tightness, she increased her nebulizers and rescue inhalers and showed improvement after three days. (Tr. 391).

Plaintiff treated with Dr. Scott three times in 2013. On March 18, 2013, plaintiff reported that she had mild drainage but no specific stuffiness, her congestion remained reasonably clear, she had no upper respiratory infections, and her wheezing was doing much better. (Tr. 390). Dr. Scott opined that plaintiff was improving and had clear lungs. (Tr. 391). On June 12, 2013, plaintiff reported that she had a mild increase in her symptoms of shortness of breath with a worsening cough. (Tr. 387). Plaintiff's symptoms, however, improved after she restarted her nebulizers. (*Id*.). Plaintiff also reported her sinuses and asthma had improved. (Tr. 388). Plaintiff exhibited normal chest movement and breathing. (Tr. 389). On August 30, 2013,

plaintiff reported difficulties with nasal congestion for the past six weeks. (Tr. 387). Dr. Scott noted that plaintiff is "in her most difficult season and this will continue until the end of September." (*Id*.). Dr. Scott found that plaintiff's "[a]sthma [is] currently doing well." Plaintiff's cardiovascular rate and rhythm S1 and S2 were normal without murmurs, gallops, or rubs, and plaintiff's lungs were clear to auscultation and percussion symmetry tactile fremitus were normal. (*Id*.).

On January 7, 2014, plaintiff's pulmonary examination showed normal chest movement and no rales or wheezing. (Tr. 385). On January 22, 2014, however, plaintiff presented to the emergency room at The Christ Hospital complaining of shortness of breath. (Tr. 353). Plaintiff reported the last time she was admitted to the hospital was several years ago. (*Id*.). On examination, the emergency room physician found diminished breathing sounds and diffuse expiratory wheezing. (Tr. 355). After undergoing a nebulizer treatment and steroids, the physician reported "significant improvement" and "excellent air exchange with no wheezing." (*Id*.). A chest x-ray showed no acute cardiopulmonary disease. (Tr. 359). Plaintiff was released from the hospital less than two hours after she arrived. (Tr. 355, 371).

When seen by Dr. Scott on January 24, 2014, plaintiff reported that she went to the emergency room because she "felt very bad" after "being exposed to her daughter, who had the flu." (Tr. 383). Dr. Scott observed wheezing and adjusted plaintiff's medications. (*Id*.). On January 31, 2014, plaintiff reported that her breathing had improved on nebulizers and supplements and had "no substantial wheezing." (Tr. 382). On examination, her lungs were clear to auscultation and percussion and her "sinuses [had] improv[ed] substantially." (*Id*.).

On March 31, 2014, plaintiff reported "substantial improvement in her symptoms" (Tr. 381), and by December 2014, plaintiff reported that her "asthma ha[d] improved substantially." (Tr. 378). In March 2015, plaintiff had marked increased cough and chest congestion associated with acute sinusitis and congestion. (*Id*.). Plaintiff began medication as instructed but showed no improvement. Plaintiff improved after switching medication. (*Id*.). Dr. Scott noted that plaintiff was using her nebulizers only once a day, was not waking up at night, remained on nasal sprays as well as antihistamines, and was heading into a more difficult time due to pollen. (*Id*.). On examination, plaintiff's lungs were clear to auscultation bilaterally and normal to percussion bilaterally. (*Id*.).

On September 17, 2015, Dr. Scott noted that plaintiff "has done well through the summer." (Tr. 432). On examination, plaintiff's lungs were clear to auscultation and percussion and symmetry tactile fremitus and effort were normal. (*Id*.). On December 1, 2015, Dr. Scott noted that plaintiff was breathing better and had a substantial reduction in postnasal drip after completing a course of Ceftin 500mg twice a day. (Tr. 430). Dr. Scott also reported that plaintiff's "asthma without exacerbation [was] currently doing very well" and she was to remain on her current medications. (*Id*.).

On January 26, 2016, plaintiff reported some mild nasal stuffiness, congestion, and persistent left ear pain. (Tr. 419). She had become increasingly more reliant on her nebulizers. Examination showed no apparent distress, her lungs were clear to auscultation and percussion, there was no pleural rub, symmetry tactile fremitus and efforts were normal, extremities were

14

without cyanosis, and she was alert and oriented with normal mood and affect. (*Id*.). A chest x-ray taken on this date revealed no active chest disease and her lungs were clear. (Tr. 474).

Dr. Scott completed a Pulmonary Residual Functional Capacity questionnaire on January 26, 2016 in which he listed plaintiff's diagnoses as moderate persistent asthma and recurrent sinusitis. (Tr. 410-413). Dr. Scott reported that plaintiff's symptoms included shortness of breath, chest tightness, wheezing, episodic acute asthma, bronchitis, sinusitis, fatigue, and coughing. Her acute asthma attacks were caused by upper respiratory infections, allergens, irritants, volatile chemicals, and changes in the weather. (Tr. 410). He reported that plaintiff's asthma attacks occur two to three times a month and they last for two weeks at a time. (Tr. 410-11). Dr. Scott opined that plaintiff's asthma was intense enough to constantly interfere with attention and concentration and she was incapable of even low stress jobs. Dr. Scott also opined that plaintiff could walk less than two hours and sit about two hours in an eight-hour work day and would need unscheduled breaks sitting quietly for fifteen minutes every two hours. (Tr. 412). He opined that plaintiff could lift no weight, never twist, bend, crouch, climb ladders or stairs, and must avoid all exposure to temperature changes, humidity, wetness, smoke, perfumes, soldering, cleaners, odors, dust, and chemicals. (Tr. 412-13). According to Dr. Scott, plaintiff would be absent from work more than four days per month. (Tr. 413). Dr. Scott opined that exposure to volatile chemicals and strong odors would precipitate a severe reaction to breathing. (*Id*.).

In March 2016, Dr. Scott noted that plaintiff had a recent exacerbation with her asthma due to a sudden change in weather but had improved. Dr. Scott also noted that plaintiff's acute

sinusitis had improved and that her chest pain was resolved. (Tr. 454). On May 12, 2016, plaintiff reported increased symptoms of cough and shortness of breath. (Tr. 456). On September 13, 2016, plaintiff similarly reported increased respiratory difficulties and said that she had been using her nebulizers on a more regular basis. (Tr. 457). Dr. Scott noticed "faint expiratory wheezing" on examination. (*Id*.). On November 1, 2016, plaintiff reported that her sinuses had improved after two rounds of Cipro and Clindamycin and stated that her asthma was "doing much better." (Tr. 459). In January 2017, plaintiff reported to Dr. Scott that after she "had difficulties in December," she completed a one-month taper of prednisone followed by Cipro and Clindamycin and was back to her usual baseline with no persistent symptoms of shortness of breath, chest tightness, or wheezing. (Tr. 461). Plaintiff reported that her sinuses were doing very well and she had no flareups. (*Id*.). On March 20, 2017, plaintiff similarly reported that her asthma was doing much better. (Tr. 463).

Plaintiff underwent pulmonary function testing in April 2017 which noted good patient effort and cooperation. The results, however, did not meet ATS standards due to plaintiff being unable to push air out and pull air in. (Tr. 478). When seen by Dr. Scott the following month, he noted the flow volume loop showed a mild obstructive ventilatory defect consistent with plaintiff's symptoms. (Tr. 465). He noted that plaintiff had difficulty completing this test as she has had a recurrent exacerbation of her underlying asthma and sinus infections. (*Id*.).

On August 22, 2017, Dr. Scott found no wheezing to auscultation, her percussion was normal, and her symmetry tactile fremitus and effort were also normal. (Tr. 467). On October 2, 2017, plaintiff reported a marked worsening of her sinus congestion drainage and pain. (Tr.

468). Plaintiff also reported that she was "having difficulties with day-to-day activities on a daily basis." (*Id.*). Later that month, Dr. Scott noted that plaintiff was "doing better." (Tr. 469). On November 22, 2017, Dr. Scott found clear lungs on examination and stated that plaintiff appeared to be in no apparent distress. (Tr. 473).

The ALJ afforded "little weight" to Dr. Scott's January 26, 2016 opinion because it was "inconsistent with the record as a whole, particularly the doctor's own examination records[.]" (Tr. 22). The ALJ specifically pointed to Dr. Scott's opinion that plaintiff would be absent from work more than four days per month—remarking that the doctor's own examination records "repeatedly reflect normal pulmonary findings and an undistressed appearance, without any mention of difficulty with prolonged standing or walking, or any kind of weakness or fatigue." (*Id.*). The ALJ also noted that Dr. Scott's opinion that plaintiff would be absent from work more than four days per month due to her symptoms was also inconsistent with plaintiff's testimony that "she had no overnight hospitalizations for asthma/respiratory symptoms since her alleged onset date. [Plaintiff] reported her last hospital admission for asthma was 10 years ago[.]" (*Id.*, citing Tr. 440).

While the ALJ may not have explicitly addressed each of the six factors under 20 C.F.R. §§ 404.1527(c)(2), 416.927(c) for weighing a treating physician's opinions, the ALJ nevertheless satisfied the "good reasons" standard. *See Dugan v. Comm'r. of Soc. Sec.*, 742 F. App'x 897, 904 (6th Cir. 2018) (citing *Tilley v. Comm'r of Soc. Sec.*, No. 09-6081, 2010 WL 3521928, at *6 (6th Cir. Aug. 31, 2010) ("indicating that, under *Blakley* and *Wilson*, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(d)(2) for weighing medical

opinion evidence within the written decision.")); *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) ("[T]he ALJ . . . is [not] required to discuss each piece of data in its opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."). The ALJ thoroughly considered the evidence as a whole, gave comprehensive reasons for discounting Dr. Scott's opinions, and those reasons are substantially supported by the record.

First, the ALJ reasonably determined that Dr. Scott's treatment notes did not support the restrictions he assessed that plaintiff would be absent from work more than four days per month. The ALJ thoroughly reviewed the entirety of Dr. Scott's treatment notes and found that they repeatedly disclosed normal findings without any mention of difficulty with standing, walking, or any kind of weakness or fatigue. (Tr. 22-23). *See Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 475 (6th Cir. 2008) ("Unlike the cases where [the Sixth Circuit has] held that the ALJ failed to state 'good reasons' for rejecting the treating physician's opinion, here the ALJ did not merely cast aside the treating physician's opinion without explanation."); *see also Alpajon v. Comm'r of Soc. Sec.*, No. 1:13-cv-617, 2014 WL 4626012, at *5, 6 (S.D. Ohio Sept. 11, 2014) (the ALJ did not err in failing to give the treating physician's opinion controlling weight because the opinion was inconsistent with his own treatment notes as well as his interpretation of plaintiff's imaging studies).

The ALJ found that Dr. Scott's treatment records from September 2012 to November 2017 consistently revealed normal breathing patterns. (Tr. 396, 391, 389, 387, 385, 382, 378, 432, 467, 473). Further, plaintiff's two chest x-rays undergone during this time period showed

no evidence of acute cardiopulmonary disease.  (Tr. 359, 474).  Furthermore, plaintiff's treatment records demonstrate that any difficulty with breathing, wheezing, or chest tightness exhibited by plaintiff was remedied by the routine use of her nebulizers and/or rescue inhalers. (Tr. 391, 387, 355, 382, 378, 419, 459, 461).  The ALJ also reasonably determined that Dr. Scott's opinion that plaintiff would miss work more than four days per month was also inconsistent with the medical evidence of record that showed "[o]ver the course of several years, the record confirms only a single visit to the emergency room for an asthma exacerbation, which was relieved with treatment the same day."  (Tr. 20).

The ALJ found that from January 2016 to November 2017, Dr. Scott's "overall examination findings" reflected "that her lungs were clear to auscultation and percussion there is no pleural rub, symmetry tactile fremitus and effort [were] normal, extremities without edema, clubbing or cyanosis and she was found to be alert and oriented three A/Ox3 with normal mood and affect (Exhibit 8F)."  (Tr. 23).

In addition, the ALJ reasonably determined that Dr. Scott's restrictions were inconsistent with the other medical evidence of record, which consisted of largely normal examination findings.  (Tr. 19-21).  The ALJ noted that Dr. Martin Fritzhand's consultative examination in March 2016 showed unlabored breathing and clear lung sounds "without rales, rhonchi, wheezes or evidence of cyanosis."  (Tr. 19, citing Tr. 440-41).  Moreover, pulmonary function testing performed by Dr. Fritzhand produced results "within normal limits."  (*Id*., citing Tr. 444-46). Following this consultative examination, Dr. Scott "continued to note clear lungs and normal breathing at examinations through the close of 2017, apart from only two visits on September 13,

2016 and October 2, 2017, during which he observed decreased air entry and 'faint' wheezing."
(Tr. 20, citing Tr. 456-57, 459, 461, 463, 465, 467-69). By September 2017, Dr. Scott's
examination findings showed clear lungs and plaintiff appeared to be in no apparent distress.
(Tr. 20, 23). The ALJ also reasonably found that Dr. Scott's restrictions were unsupported by
plaintiff's activities of daily living, which included driving two to three days a week since her
alleged onset date, walking two to three blocks at a time, and grocery shopping on a weekly basis
"up to a couple of hours." (Tr. 22)

This evidence substantially supports the ALJ's finding that Dr. Scott's opinion was not
entitled to controlling weight. The ALJ thoroughly reviewed the evidence of record and
explained her "good reasons" for giving Dr. Scott's opinion "little weight." Plaintiff has not
cited any evidence to show the ALJ's analysis lacks substantial support. Accordingly, plaintiff's
second assignment of error is overruled. *See Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109,
112-13 (6th Cir. 2010) (treating physician's opinion not entitled to controlling weight where it
was inconsistent with his own prior reports and treatment notes); *see also Hill v. Comm'r of Soc.
Sec.*, 560 F. App'x 547, 549-50 (6th Cir. 2014) (treating pain management specialist's opinion
not entitled to controlling weight where it was inconsistent with his treatment notes and results of
imaging studies); *Davidson v. Comm'r of Soc. Sec.*, No. 1:12-cv-683, 2013 WL 5670977, at *6-8
(S.D. Ohio Oct. 15, 2013), *report and recommendation adopted*, 2014 WL 1271023 (S.D. Ohio
Mar. 27, 2014) (The ALJ's finding that the treating physician's opinion was not supported by his
own treatment notes was substantially supported by the record).

**IT IS THEREFORE ORDERED THAT:**

The decision of the Commissioner is **AFFIRMED** and this case is closed on the docket of the Court.

Date:  3/5/2021

Karen L. Litkovitz
Chief United States Magistrate Judge